CONNECTICUT MUT. LIFE INS. Co. v. SCAMMON and others.

*(Circuit Court, N. D. Illinois.  ——, 1880.)*

1. POLICY OF INSURANCE—LIFE TENANT—REVERSIONERS—MORTGAGOR AND MORTGAGEE.—A policy of insurance running in terms to a life tenant, and procured as additional security under the covenants of a mortgage jointly executed by such life tenant and the owners of the reversion, *held*, under the circumstances of this case, to enure to the joint benefit of all the mortgagors.

2. LIFE TENANT—WAIVER OF INSURANCE MONEY—MORTGAGOR AND MORTGAGEE.—*Held, further*, that the authority of such life tenant to waive the application of the proceeds of such insurance policy upon the mortgage debt could not be inferred from a general power to insure the mortgaged property.

3. SAME—SAME—CONSENT—SILENCE.—*Held, further*, that consent to such waiver could not be inferred from the silence of the owners of the reversion, when they had no knowledge of the transaction.

4. SAME—MORTGAGEE—APPLICATION OF INSURANCE MONEY.—*Held, further*, that if, in any view of the case, the mortgagee could, without the knowledge of the owners of the fee, agree with the life tenant to place the proceeds of the insurance policy back upon the mortgaged premises, he was bound to see that such agreement was carried out, and that the money was so used.
   *Gordon* v. *Ware Savings Bank*, 115 Mass. 588, considered.

5. EQUITY PRACTICE—APPLICATION OF INSURANCE MONEY.—*Held, further*, that the rules of equity practice were sufficiently flexible to admit the proper application of the insurance money to the mortgage debt in this case.

6. POLICY OF INSURANCE—LOSS PAYABLE TO MORTGAGEE—ASSIGNMENT—COLLATERAL SECURITY.—A provision in a policy of insurance, that the loss should be payable to the mortgagee, operates to give the mortgagee precisely the same rights and interest in a policy which he would have had if, without such words, the policy had been assigned as collateral security to the mortgage debt.
   Jones on Mortgages, § 407

*Isham & Lincoln*, for complainant.

*C. F. White*, for defendants Florence A. D. Reed and Arianna E. Scammon.

DYER, D. J.  This a bill for foreclosure of a mortgage executed to complainant in 1866 by the defendants J. Y. Scammon, Florence A. D. Reed, formerly Scammon, and Arianna

E. Scammon; the two defendants last named being daughters of the defendant J. Y. Scammon. The mortgage originally covered lot No. 5, in block No. 11, in Fort Dearborn addition to Chicago, and was made to secure the payment of $30,000 and interest. It is admitted in the bill that in 1867 the sum of $10,000 was paid to apply on the principal, and it is alleged that the balance of the original principal, namely, $20,000, with interest, remains unpaid, besides certain sums of money paid by complainant to redeem the mortgaged premises from tax sales. Defences have been interposed by the defendants Florence A. D. Reed and Arianna E. Scammon, and the case has been heard upon their exceptions to the report of the master to whom the cause was referred.

Originally, the mortgaged premises were owned in her separate right by Mary Ann H. D. Scammon, then the wife of the defendant J. Y. Scammon, but since deceased. Upon her death, the property by descent passed to her three children, Charles T. Scammon, and the defendants Florence A. D. Reed and Arianna E. Scammon, subject, however, to a life estate therein of their father. Subsequently, but prior to the execution of the mortgage in suit, Mr. Scammon acquired the interest of his son, Charles T. Scammon; so that at the date of the mortgage he was the owner in fee of an undivided one-third interest in the premises. This being the state of the title, on the tenth day of September, 1866, Mr. Scammon and his two daughters joined in the execution of a bond to the complainant, conditioned for the payment of the sum of $30,000 on the tenth day of September, 1871, with interest payable half yearly at 8 per cent.; and to secure the payment of this bond they executed the mortgage in question. This bond and mortgage were given to secure the repayment to complainant of a loan then made for the purpose of erecting a building on the premises; and the money thus borrowed and secured was so used.

The mortgage contained a clause binding the mortgagors to keep the buildings thereafter erected on the premises insured against loss or damage by fire, and to assign and deliver to complainant the policies of insurance therefor, whenever such

insurance should be effected; and it was further provided that the complainant should hold such policies of insurance as collateral and additional security for the payment of the principal sum, secured by the mortgage, and interest, and should have the right to collect and receive all sums of money that might at any time become collectible upon such policies of insurance, and apply the same, when received, in the same manner, as far as possible, as was provided in the mortgage in case of a sale of the mortgaged premises under the power of sale therein contained. Pursuant to these requirements of the mortgage insurance was obtained, in the sum of $15,000, upon the building erected on the premises. The policy of insurance, in terms, run to J. Y. Scammon alone, and contained a clause in the usual form: "Loss, if any, payable to the Connecticut Mutual Life Insurance Company."

On the tenth day of September, 1867, by agreement between J. Y. Scammon and his daughters, a partition of the mortgaged premises was made by which the south one-third thereof was set off to Mr. Scammon as the parcel in which he should thereafter have a clear estate in fee; and the north two-thirds were set off to the defendants Florence A. D. Reed and Arianna E. Scammon, to be held by them in fee, subject, however, to the life estate of their father. The object of this agreement of partition appears to have been to enable Scammon to convey the south one-third of the lot to the Marine Company of Chicago, and to enable his daughters, at his death, to hold the north two-thirds of the lot free from all other claims of title under Mr. Scammon. Concurrently with the making of this partition $10,000 was paid to complainant to apply on the principal of the bond and mortgage in suit, and the south one-third of the mortgaged premises so set off to Mr. Scammon was then released by complainant from the lien of the mortgage, and thereafter his interest in the mortgaged premises yet covered by the mortgage consisted of a life estate; and it is understood that the building then situated on the premises stood upon that part of the same set off under the partition to Mr. Scammon's two daughters.

This building was totally destroyed in the great fire of October, 1871.

In settlement of the insurance on the same the fire insurance company delivered to the defendant Scammon a draft for $15,000, payable to the order of complainant; and thereupon Scammon, in a communication addressed to the secretary of the complainant, informed him that he had commenced rebuilding the burned structures, and enclosed therein the draft received for insurance, and requested that authority might be given to complainant's Chicago agent to pay over to him (Scammon) or to the Marine Company, the proceeds of the draft, to be expended in such rebuilding. This request resulted in an agreement, made on the fifth day of January, 1872, between complainant and J. Y. Scammon alone, by which it was agreed that complainant should and did waive its right to apply the insurance money on the mortgage indebtedness, and that this money should be deposited in such bank as should be selected by Scammon and assented to by complainant, to the credit and at the risk of Scammon, to be used in the erection of buildings on the mortgaged premises; that this money should be paid out in the erection of such buildings, from time to time, on the drafts or checks of Scammon, countersigned by complainant's agent, until it should be thus fully expended; further, that such drafts or checks should be so countersigned on presentation thereof to complainant's agent, accompanied with the certificate of an architect, that the amount of such check or draft, together with all previous checks or drafts drawn or paid out on such account, had been actually expended in permanent improvements upon the mortgaged premises; further, that so soon as the building or buildings so erected should be in a situation to be insured, Scammon should cause the same to be insured in the fair insurable value thereof, and assign the policies of insurance to complainant, and that thereupon all the provisions contained in the mortgage should apply to such insurance.

By this agreement it was further provided that any receipt or acknowledgment given by complainant, either alone or

jointly with others, to any such insurance company, for the purpose of facilitating the collection by Scammon of any insurance money intended to be placed back on the mortgaged premises, should not be construed as a collection of the money by complainant under the conditions of the mortgage, wherein it was provided that complainant might collect and apply such insurance money upon the indebtedness secured to be paid thereby, but should be regarded as merely enabling Scammon to collect such insurance money; and it was expressly provided that this money was not to be so applied, and that the mortgage should remain a lien on the premises for the full amount of the principal sum mentioned in the bond, with interest, as if said insurance money had never been collected. It was also agreed that in case the insurance money should not be expended in rebuilding, within six months from the date of the agreement, then said agreement of waiver should have no effect, but that the right of Scammon to use and expend the same should thereupon cease, and that complainant should have the right to draw from the bank where the same was deposited, upon its own check, said insurance money, or so much thereof as had not then been actually expended, and apply the same in payment, *pro tanto,* of the indebtedness secured by the mortgage.

Thereupon complainant, by its secretary, by indorsement on the draft for $15,000 received from the fire insurance company, made the same payable to J. Y. Scammon, or order, who designated the Marine Company of Chicago as the banking office in which the insurance money should be deposited, and delivered the same back to Scammon so indorsed, and the proceeds of the draft were then received by Scammon and deposited with the Marine Company. Thereafter the money thus realized on account of the insurance, and so deposited, was drawn out by the defendant Scammon on his own checks or drafts, and not in pursuance of the aforesaid agreement between him and complainant; but new structures were not erected on the mortgaged premises, and the proceeds of insurance were not used by Scammon for that purpose as contemplated by the agreement. Further mate-

rial facts in the case are that when complainant originally took the mortgage in question, it, by its agent, knew the state of the title of the mortgaged premises; that in the erection of the building on the premises, in causing it to be insured, and in collecting rents, and paying premiums and taxes, the defendant J. Y. Scammon dealt with the property as if it were his own; and that the entire business connected with the loan from complainant, from the time of its original negotiation down to the time of the before-mentioned agreement in relation to the insurance, was transacted by the defendant Scammon. The evidence tends to show that he kept an account with the property on his bank ledger, in which rents received by him were credited; and that, either in this or in a separate account, moneys paid by him for insurance premiums were also entered.

It appears, further, that the defendants Florence A. D. Reed and Arianna E. Scammon knew nothing at the time of the insurance obtained upon the property, nor of the agreement in relation to the insurance money between their father and complainant, made in 1872. There is no doubt that when complainant consented to the payment of the insurance money to Scammon, it was expected that it would be used in rebuilding, and that it was paid to and received by him in good faith for that purpose; and there is evidence to the effect that the officers of the bank understood at the time that this money was placed in the bank in the character of a special deposit, and subject to the conditions of the agreement between complainant and Scammon. Further, it seems clear that Scammon was never expressly authorized by complainant to draw out or appropriate the money as he seems to have done. Indeed, the performance of the agreement, under which the insurance money was surrendered to Scammon and deposited in the bank, seems to have been abandoned by both parties thereto, as it does not appear that the contract was at all regarded by Scammon in the appropriation of the money, nor was it insisted upon by complainant, so far as the evidence discloses.

The two mortgagors, Florence A. D. Reed and Arianna E.

Scammon, according to the evidence, were not consulted about the disposition of the insurance money, and, so far as is shown, had no knowledge of and gave no consent to its payment to their father, or to its deposit in the bank; nor have they ever asserted any rights in relation thereto until the commencement of this suit.

Upon the case stated it is insisted by the defendants, who contest complainant's right to a decree, that the insurance money in question was in legal effect collected by complainant, and, in fact, came to its hands; that complainant had no authority to surrender the same to the defendant J. Y. Scammon; that its receipt by complainant constituted satisfaction *pro tanto* of the mortgage; that the covenant in the mortgage for insurance operated as an assignment of the insurance fund, when collected, to the mortgagee; and that it could not, under any arrangement made with J. Y. Scammon, without their consent, be legally paid back to him and the mortgage be still kept in force, to their prejudice, and as a continuing or renewed encumbrance upon their interest. On the other hand, it is contended that the defendant J. Y. Scammon had an insurable interest in the mortgaged premises; that all of the mortgagors agreed in their mortgage to furnish insurance to the full value of their insurable interests; that the two defendants who make defence procured no insurance on the property or their interest therein; that the policy of insurance run to J. Y. Scammon alone, and, therefore, that he could recover upon the policy no matter what his interest in the property was; that his daughters had no interest in the proceeds of the insurance; that the policy was held by complainant as collateral security; that it could elect, if it chose, not to collect the insurance, and, if collected, it could rightfully pay the money back to the party insured; that the daughters had no interest or concern in the transaction, and that the insurance which was obtained only in legal effect covered the interest of J. Y. Scammon in the property.

In reply it is urged that the insurance was procured as additional security to the mortgage; that, though it was taken in the individual name of J. Y. Scammon, it was furnished

under the covenants of the mortgage, and that it did not enure to the benefit of J. Y. Scammon alone, but was treated by all the parties as, and was in fact, a proceeding for the benefit of all, and which protected the interests of all.

Upon complainant's theory, therefore, the $15,000 received on account of the insurance is not to be treated as a payment upon the mortgage, or as money received by complainant which it was bound to apply upon the mortgage; while, on the theory of the contesting defendants, that money should have been applied in payment of the mortgage indebtedness, and its receipt by complainant operated as a satisfaction *pro tanto* of the mortgage, so far as the interests of those defendants were involved, and so left unpaid only the sum of $5,000 and interest.

Upon the assumption that the policy of insurance covered not only the interest of J. Y. Scammon in the insured property, but also that of his daughters, it becomes important, first, to inquire whether, in making the agreement with complainant by which the insurance money was surrendered to Scammon, he acted not only for himself but also as the authorized representative of his daughters; because, if in that transaction he was their authorized agent, it is obvious they could have no ground of complaint, and that would end this controversy. Manifestly he stood in a twofold relation to the property— *First*, as the owner of the life estate; and, *secondly*, as the representative, to a certain extent, of the owners of the reversion. The individual acts of Mrs. Reed and Arianna Scammon, in connection with the property, done at the time of, and subsequent to, the original loan, appear to have been limited to the execution of the bond and mortgage in the suit, and the making of the agreement of partition with their father. It must be assumed that he was left with unrestricted authority to manage the property to the extent of erecting buildings thereon, collecting rents, paying taxes, and procuring insurance. So far as those acts affected the interests of the owners of the fee, they must be considered as done under authority, express or implied. Moreover, as to some if not all of such acts, he had not only the legal right,

but as the owner of the life estate, receiving the rents and profits, it was his legal duty to do them.

As the mortgage contained a covenant to keep the buildings insured, and as the care and management of the property were entrusted wholly to Mr. Scammon, it is clear that his act of procuring insurance as additional security to the mortgage was within the scope of his agency as the representative of the interest of his daughters. It was a legitimate incident to the business of managing and preserving the property. But it is not to be overlooked that this and the other acts before specified were such as touched the property in its character as real estate, and the question is, could authority to make the special agreement in relation to the insurance money, so far as it affected the interests of his daughters, be implied from the general power he possessed and exercised over the property? I am of opinion it could not. In support of this conclusion it is to be borne in mind that the instrument which required insurance to be obtained, and which in its provisions controlled the destiny of the insurance money, was executed not by Mr. Scammon, for and as the agent of his daughters, but by those persons acting for themselves. The covenants and stipulations of the mortgage were made effective by their own signatures and seals. The origin of the obligations and rights of all the parties with reference to insurance, and any moneys derived therefrom, was the mortgage; and, direction having been therein given as to the ultimate disposition of the same, so serious a departure therefrom as a waiver of valuable rights and a diversion of the fund would involve, would require the sanction of the owners of the fee, so far as their interests were concerned. The waiver of rights established by the mortgage, the virtual revocation of special contract provisions, involved an extraordinary power, not falling within such general control over the property as the owner of the life estate was accustomed to exercise. It was outside the scope of his agency, and not properly incident to any general powers pertaining thereto. Consent on the part of the owners of the fee to any diversion

of the insurance moneys cannot be inferred from their silence, because they had no knowledge of the transaction.

It will be understood that all this is said upon the theory that the contesting defendants had an interest in the insurance, and in such application of the insurance fund as the mortgage contemplated; and it is also said in the light of the fact that that fund was allowed to be personally appropriated by the owner of the life estate, and was not used in rebuilding. How far the equities of the parties might have been affected if the moneys had been used in rebuilding, and whether that might not have been regarded as a restoration of the lost property, and therefore a benefit to the parties interested equivalent to an application of the moneys on the mortgage debt, are questions not necessary here to be considered. The facts, as we now have them, are that this agreement was made; that the owners of the fee were not parties to it, and never authorized it; that that agreement, even in the form in which it was made, was not performed; that performance was not required by complainant; and that the insurance moneys were ultimately diverted so that they neither benefited the mortgaged property nor were applied upon the mortgage debt.

The more difficult question is, had the owners of the fee any such interest in this insurance, or any such rights in the ultimate disposition of it, as to enable them to question the transaction in relation thereto between their father and complainant? The proposition that the insurance only covered the interest of Mr. Scammon in the property, was urged with so much force on the argument that I have not been without doubt in considering the question. Undoubtedly, as life tenant, he had an insurable interest in the property. And when the language of the policy, which is that the insurance company "do hereby insure J. Young Scammon * * * * against loss or damage by fire to the amount of $15,000 * * * * on the four-story and basement brick building," etc., is considered, disconnected from other extrinsic facts, there is certainly force in the view that his interest only was

insured.    But it is to be borne in mind that the interests of all the mortgagors in the mortgaged property, in common and without severance, was pledged for payment of the debt. Further, that the mortgage covenanted generally for insurance, and that it did not specify the several interests of the covenantors.    The building was part of the realty, and the interests were undivided.    They were dealt with as a unit. The obligation was not in terms that each mortgagor should cause his and her interest to be severally insured for the benefit of the mortgagee.    Further, as before indicated, it was the legal duty of the defendant Scammon, as the life tenant receiving the rents and profits, to keep the building, as an entirety, insured, and in procuring insurance he must be held the agent of his daughters so far as their interests were involved.    And when we consider the terms of the policy of insurance, as it is right to do, in connection with the covenants and stipulations in the mortgage, and the relations at the time of all the parties to each other, the conclusion must be, I think, that this insurance was obtained in pursuance of the requirements of the mortgage, and under the circumstances the presumption is that it covered what the mortgage specified, namely, the fair insurable value of the building, as an entirety, and in which were united the undivided interests of all the mortgagors.

The view thus taken is strongly confirmed by the manner in which the insurance proceeds were dealt with by complainant.    The loss was payable by the terms of the policy to the mortgagee.    The draft of the fire insurance company was payable to the mortgagee's order.    It was evidently received and treated as a fund to be either applied on the debt or to be used in restoring the original security.    The acts of complainant were equivalent to a collection of the insurance, for it had the draft in hand, indorsed it to Mr. Scammon by ordinary commercial indorsement, and assumed to control the ultimate destiny and use of the proceeds.    If the money was to be relinquished and not to be applied on the mortgage debt, it is clear that complainant understood that the legal rights of the parties required that it be placed back on the mortgaged

premises, and hence the stringent provisions to that end in the agreement of January, 1872; and it was, of course, understood that the restoration of the building on the · premises would enure as well to the benefit of the owners of the fee as to that of the owner of the life estate. So I say complainant dealt with the insurance not as Mr. Scammon's money, but as a further security furnished under the mortgage, and as something which affected the rights of all the mortgagors in the property, and in which all were interested.

If this be the correct view of the question the remaining question, which relates purely to the *rights* of the parties, would seem not to be difficult of solution. The provision of the policy, that the loss should be payable to the mortgagee, operated to give the mortgagee precisely the same rights and interest in the policy which it would have had if, without such words, the policy had been assigned as collateral security to the mortgage debt. 1 Jones on Mortgages, § 407, and cases cited. The proceeds of the insurance in the hands of complainant represented the insured property and the interests of all the mortgagors therein. The control exercised over the same by the mortgagee was equivalent to an election by it under the provisions of the mortgage to collect and receive the money. This being so, it was complainant's duty to use and apply it in accordance with the spirit of the provisions of the mortgage, and for the benefit of the parties beneficially interested, unless they consented to some other disposition of it. Indeed, it is difficult to perceive why, upon general principles of equity, so far as the rights of the owners of the reversion were concerned, complainant could not have been required to have had recourse to the insurance money as collateral security for payment *pro tanto* of the mortgage. If, in any view of the equities of the case, complainant might, without the knowledge of the owners of the fee, agree with the life tenant to place the money back on the mortgaged premises, it was bound to see that such agreement was carried out, and that the money was so used. Failing in this, and having as mortgagee received and undertaken to deal with the insurance proceeds as a fund representing the property,

equity will consider that as done which ought to have been done, and must therefore, so far as the interests of the non-consenting mortgagors are concerned, charge complainant with this fund and treat it as operative to satisfy the mortgage *pro tanto.*

The case at bar is distinguishable from *Gordon* v. *Ware Savings Bank,* 115 Mass. 588, which was cited by the learned counsel for complainant on the argument. That was a case where mortgaged premises were injured by fire, and the amount of the loss was paid by the insurer in pursuance of its agreement with the mortgagor to the first mortgagee, who subsequently paid the amount to the mortgagor to be applied in repairing the premises, so as to make them as valuable as before the fire; and in this case it was held, under the facts, that the holder of a second mortgage had no equity to have the amount so received applied in reduction of the debt secured by the first mortgage. The facts were that at the time the first mortagee received the insurance money the mortgage debt was not due, and the mortgagor did not consent to the application of the money on the mortgage; and, moreover, and as a controlling feature of the transaction, the money was applied by the mortgagor to the restoration of the impaired security, for the benefit alike of all parties interested. These circumstances, of course, vitally affected the equities of the second mortgagee.

The point was made on the argument that the insurance money could not be applied on the mortgage debt without reducing the liability of the defendant Scammon equally with that of his co-obligors on the bond, which would be manifestly wrong. And the question was put, where can the line be drawn in the proposed application of this money in reduction of a liability which is joint, and which is secured by the pledge of interests that are undivided? The answer is that the rules of equity practice are sufficiently flexible to meet the case. The life estate may be charged with the same burden of liability as it was originally chargeable with, added to which is the personal liability of the defendant Scammon; and the estate of the owners of the fee may be charged with the proper proportion

of liability, namely, $5,000, and interest. The decree can provide for a sale of the life estate as a security for the debt, unaffected by anything that has transpired between its owner and complainant, and suitable provision can be made touching the personal liability of the defendant Scammon for any deficiency. Further, the same decree can direct a sale of the interest of the other mortgagors to pay so much of the debt as is in excess of the $15,000 realized from the insurance.

To the extent indicated the exceptions to the master's report will be sustained, and decree in conformity to this opinion.